### SOUTHWESTERN BELL TELEPHONE CO. v. COOK.

### No. 12333.

Court of Civil Appeals of Texas. Fort Worth.
May 17, 1930.

Rehearing Denied June 21, 1930.

Nelson Phillips and C. M. Means, both of Dallas, and H. E. Lobdell, of Decatur, for appellant.

Burch & Woodruff and C. T. Gettys, all of Decatur, for appellee.

CONNER, C. J.

This appeal is from a judgment in favor of appellee, Cook, for the sum of $1,000 assessed as damages for "mental anguish" alleged to have been caused by the failure of appellant company to exercise due care and dispatch in transmitting and delivering a long-distance telephone call from Bridgeport, Tex., to Fort Worth, Tex.

The judgment rests upon the following facts as substantially stated, to wit: Appellee at the time was living near the town of Bridgeport in Wise county, and was notified that his son had been accidentally killed in the town of Moran, in Shackelford county, some 140 miles distant; that he was without means of conveyance and called upon a Mr. Fred Chilton to place with the appellant telephone company a call for appellee's son-in-law, W. G. Bischofhausen, at the time living at 814 West Second street, Fort Worth, Tex. Mr. Chilton testified that he placed the call with appellant's operator, a Miss Wilkerson, at Bridgeport, at about 12:03 a. m. January 23, 1928; that Miss Wilkerson was informed that it was a death message and it was desired that she get the call through as quickly as she could; that the reason for dispatch was that Mr. Bischofhausen, appellee's son-in-law, was wanted by Mr. Cook to come to his house with his car and go with him to Moran. Mr. Chilton's testimony on this point is that he told Miss Wilkerson the call was "in reference to Mr. Cook's son being killed, and to come on out there as quick as he could; that Mr. Cook wanted him to go with him or to assist him in going to Moran where his son was killed."

It appears that Cook was later informed that there was no telephone at 814 West Second street and that a messenger would have to be employed for the delivery of the call; that thereupon a fee to cover the expense of the messenger was paid; that the messenger boy took the call to 814 West Second street and was met by the woman who was keeping the rooming house at that place; that the messenger, in answer to inquiry, stated that he did not know the nature of the call, but that he supposed it to be just an ordinary call, and the rooming house keeper told him that Mr. Bischofhausen was in bed asleep and that she would deliver the message in the morning. Neither Mr. Cook nor appellee having heard from Bischofhausen for several hours, they again placed a call, with information of its urgency, and this, it appears, was delivered by a messenger by placing it beneath the entrance door of 814 West Second street and was not in fact delivered to Mr. Bischofhausen until next morning about 7:30 a. m., whereupon he at once drove to Bridgeport with his car, which was in good running order, but found that Mr. Cook had already departed for Moran.

Appellee, Cook, testified to the effect that he had been informed of his son's accidental death at Moran; that he was without a car or means of transportation across the country to Moran, and that his son-in-law Bischofhausen at Fort Worth had a good car and he desired him to come to Bridgeport and take him to his son; that Mr. Chilton assured him that he would place the call and that he (Cook) dressed himself and got ready to go, expecting Bischofhausen to come within about an hour and a half; that he was walking the floor restless and did not know what to do, only just walk the floor and look for the car lights; that he waited until about 5 o'clock the next morning, and, Bischofhausen having failed to come, that he (Cook) was "just about crazy"; that "I was just wild wanting to get off to the body of my son; he was among strangers, nobody there and was just wild to get to his body."

He further testified: "After I heard of my boy's death, the delay in getting started did affect my mind; I was just crazy to get off and get to the body of my boy. I heard that he was dead and killed that night and nobody with him; he was there among strangers; I did not know what shape his body was in; after I started on the way, the further delay had an influence on my mind; I wanted to get to the body; I could not think of anything else but to get there; that was all I had on my mind, was to get to him. The delay in getting started continued to affect my mind in the manner that I have described; after I started and on the way I could not get anything else on my mind; that excited my mind; my main motive was to get to him. I loved my boy with the natural affection of any father. My feelings toward my deceased son were that I wanted to get to him; I loved him, of course, above anything else in the world; I wanted to get to his body; I did not know what shape his body was in; I was just crazy and unnerved; and could not get anything else on my mind, just wanted to get there."

On cross-examination and in reply to a question as to whether or not his anxiety to go to his son's body was just as great when he first heard of his death as it was at any other time up to the time he did get to him, appellee replied: "That was practically all there was on my mind, was to get to him; I

did not know what condition his body was in, or anything like that. I did not have anything else on my mind only to get to him; as to whether or not my main distress and suffering was on account of my boy being gone, still, at the same time I was suffering for want of getting to him. That was the main thing on my mind all the time. That feeling came on immediately and I did not cease to be anxious to get to him."

Appellee further testified that about 5 o'clock on the morning of January 23, 1928, Mr. Bischofhausen not having appeared, he hired an old Chevrolet car belonging to a neighbor and employed a boy to drive him to Moran, agreeing to pay all expenses, and to pay the boy, that the car was not in good order and they had car trouble, and that he did not finally reach Moran until between 2 and 3 o'clock of the afternoon of the same day. He further testified that his son's body reached Bridgeport the next morning; that one of his nephews accompanied it, appellee paying the expenses; that, if he had reached Moran earlier, he could have sent the body to Cisco and from Cisco to Fort Worth and on to Bridgeport by train, at a saving of some $15; that he incurred a personal expense of some $23 or $24 on the trip for transportation to and from Moran, besides the expense of the telephone calls from Bridgeport.

Telegraphs and telephones are generally treated in the statutes and authorities relating to the subject under the same general head; both are classed as public utilities, and both are engaged in the transmission of messages between separated points by means of electric forces. The telegram is transmitted in the lettered word by means of mechanical instruments over wires. In the case of the telephone, it is the vocalized word that is transmitted over the wire. The telegraph company is only required to receive, transmit, and deliver the written message with due care and dispatch. The duty of the telephone company is, by automatic contrivance or otherwise, to receive and transmit the call of one person for some other person and thus bring the two in contact for communication inter se.

In 26 R. C. L. p. 481, § 4, it is said: "Scientifically considered a telephone is an improvement in telegraphy, or an improved telegraph; it is to all intents and purposes a part of the telegraphic system of the country, and the business of a telephone company, in its broader aspects at least, is legally indistinguishable from that of a telegraph company."

The same author in the same volume, page 529, § 39, says: "The liability of a telegraph or telephone company for personal injuries is governed by the principles applicable in the case of electric companies generally. Such a company is clearly liable in damages for injuries proximately resulting from the failure to exercise the proper degree of care, to those to whom it owes the duty of such care."

We may therefore refer to the authorities relating to the subject of recoverable damages in telegraph and telephone cases indiscriminately. At common law, as a rule, no recovery of compensatory damages for mental suffering, unaccompanied by physical injury, unless resulting from the willful or malicious wrong of the defendant, is allowed. While some of the states, including Texas, enlarge somewhat the common-law doctrine, yet in none of them, so far as our investigation informs us, has it been held that damages are recoverable for every character of mental disturbance, even though proximately resulting from a negligent act or omission of another.

In 37 Cyc. p. 1780, it is said: "It is well settled, however, that damages cannot be recovered on this ground for every mental disturbance or injury to the feelings, and that to constitute mental anguish there must be something more than mere worry, vexation, or disappointment, or anger and resentment, and it must be based upon grounds reasonably calculated to produce mental suffering. There can be no recovery for mental anguish in regard to the non-delivery or delay of a mere business message, or money transfer message, or message asking for money, nor for worry over the loss of a position."

The language quoted from Cyc. is cited with approval in the case of Western Union Tel. Co. v. Chamberlain (Tex. Civ. App.) 169 S. W. 370. In that case it is said, quoting from the headnote: "Mental anguish is that keen and poignant suffering which results from some great grief; and hence mere disappointment because plaintiff's grandchildren were prevented from visiting him on account of delay in the transmission of a telegram was not mental anguish for which damages might be recovered."

Appellant insists that appellee failed to allege or prove mental anguish of a character which authorizes a recovery of damages and assigns error to the judgment. We think appellant's contention relating to the subject well taken. It seems apparent that no practical method of reasoning can be adopted which would enable us to separate the mental disturbance occasioned by the fact that a loved son had been killed and that his body was among strangers, and the further fact that as a result of the negligence of appellant's agent he was delayed in his journey several hours. To undertake to do so is to resort to mere conjecture. It is equally as difficult to classify anxiety, disappointment, or other mental reaction arising from the delay as "mental anguish" for which damages may be awarded.

In Words and Phrases, vol. 3, Second Series, p. 365, it is said: "'Mental anguish' is a

high degree of mental suffering, and not mere disappointment or regret."

Webster defines "anguish" as "extreme pain of body and mind."

■ There can be no doubt that appellee suffered anguish from the moment he was informed of his son's death; by his own statement this continued without change or abatement during the period covered by a reasonable time within which his son-in-law could come, with his automobile, in answer to the summons sent. No judicable degree of anguish was added by the further delay to deliver the call message as contemplated. Appellee in fact arrived at his son's body, and no evidence was offered tending to show that it had been subjected to any neglect or indignity. It seems to us that the most that can be said is that appellee was disappointed or resentful and caused to continue to suffer longer than he would have suffered had the call for his son-in-law been seasonably delivered. For such continuation of mental suffering no recovery in damages is allowable. This conclusion is inescapable from a reading of the cases relating to the subject. We refer not only to the case of Western Union Tel. Co. v. Chamberlain, supra, but also cite the following cases:

The case of Rowell v. W. U. Tel. Co., 75 Tex. 26, 12 S. W. 534, 535, is one in which a telegram from Athens, Tex., to Jefferson, Tex., was delivered to Mrs. Rowell stating: "Your mother is worse; come if you can; dangerously sick." Early the next morning the husband, J. H. Rowell, delivered to and paid appellee at Jefferson the regular charge to send the following telegram in answer to the one first quoted: "How is mother? If no better, Josie comes tonight. Answer my expense." To this telegram the addressee delivered to the agent of the telegraph company for transmission the following answer, to wit: "Telegram received. Mother some better. Doctor said not dangerous." It was charged that this last telegram was never delivered to Rowell, and he sought actual damages from the telegraph company for failure to perform its contract for loss of time and business to himself and mental distress in the sum of $100, and for mental and physical sufferings of his wife, $2,400. The court held that the petition was subject to a general demurrer. In so ruling the court said: "Some kind of unpleasant emotion in the mind of the injured party is probably the result of a breach of contract in most cases, but the cases are rare in which such emotion can be held an element of the damage resulting from the breach. For injury to feelings, in such cases, the courts cannot give redress. Any other rule would result in intolerable litigation."

In De Voegler v. W. U. Tel. Co., 10 Tex. Civ. App. 229, 30 S. W. 1107, the Dallas Court of Civil Appeals held that a telegraph company was not liable for mental anguish of a person to whom money was sent by telegraph, caused by its failure to deliver such money.

In Western Union Tel. Co. v. Reed, 37 Tex. Civ. App. 445, 84 S. W. 296, it was held that, where a plaintiff was not prevented from attending the funeral of her sister because of delay in delivering a telegram announcing the sister's death, but only suffered mental anguish until she procured a postponement of the funeral to enable her to be present, she was not entitled to recover damages for the telegraph company's negligence.

In Southern Pac. Ry. Co. v. Milner, 45 Tex. Civ. App. 489, 100 S. W. 1170, Milner's wife was ill and about to undergo a surgical operation and desired the presence of her mother, and plaintiff purchased transportation of defendant railroad to be delivered by defendant to the mother in a distant town to enable her to come to her daughter. Through delay in delivery of the transportation, the mother's arrival was delayed for two days, but, because of the serious illness of the daughter, the operation had been delayed until a week after the mother's arrival. The evidence showed that the wife was suffering from mental anguish by the absence of her mother before she was sent for, and before any notification came that the mother would not arrive at the time expected. It was held that plaintiff could not recover for a simple prolongation of the mental suffering of his wife, caused by defendant's negligence.

The case of Goodhue v. W. U. Tel. Co., 57 Tex. Civ. App. 297, 122 S. W. 41, by the San Antonio Court of Civil Appeals, was one in which there was a negligent delay in delivering a message informing a daughter of her father's fatal illness. The court held that damages arising from distress and mental anguish arising from her great desire to reach her father at the earliest possible moment, and from separation from her family, cannot be recovered, as her anxiety was not produced by the delay, but was merely prolonged.

In Western Union Tel. Co. v. Young, 61 Tex. Civ. App. 232, 130 S. W. 257, by this court, it was said, quoting from the headnotes: "The damages resulting from an increase and prolongation of mental distress on the part of a sick wife, because of the failure to hear promptly from her absent husband, because of the failure of a telegraph company to promptly deliver messages addressed to him and sent by him, are not recoverable, because too remote and speculative."

It is also said in the case of Western Union Tel. Co. v. Finfrock (Tex. Civ. App.) 191 S. W. 181, that "mere disappointment or embarrassment is not such mental pain or an-

guish as to permit a recovery of ·damages for delay in delivery of telegram."

See, also, Western Union Tel. Co. v. Smith, 76 Tex. 253, 13 S. W. 169; Western Union Tel. Co. v. Giffin, 93 Tex. 530, 56 S. W. 744, 77 Am. St. Rep. 896.

We conclude that the evidence wholly fails to show a right to the recovery of damages for the mental anguish alleged, and to that extent at least the requested peremptory instruction of defendant should have been given. However, the jurisdiction of the court below does not seem to have been questioned by a plea or otherwise, and, inasmuch as the evidence tends to show that the appellee suffered some actual pecuniary damage recoverable on the theory of failure to duly execute the contract undertaken, the judgment below will be reversed and the cause remanded for further proceedings not inconsistent with this opinion.